# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 07-61263-CIV-GRAHAM/TORRES

MANAGED CARE SOLUTIONS, INC.,

        Plaintiff,

vs.

BAPTIST HEALTH SYSTEM, INC.,

        Defendant.

_____/

## REPORT AND RECOMMENDATION ON
## BURSTEIN & ASSOCIATES, P.A.'S MOTION TO RE-OPEN CASE
## AND TO ENFORCE AND FORECLOSE ON CHARGING LIEN

This matter is before the Court on Burstein & Associates, P.A.'s Motion to Re-Open Case and to Enforce and Foreclose on Charging Lien [D.E. 89] pursuant to an Order of Reference entered by the Honorable Donald L. Graham, United States District Judge [D.E. 91]. An evidentiary hearing was held on October 20, 2008. The Court has also carefully considered the Motion, Plaintiff, Managed Care Solutions, Inc.'s Response, and the Reply in Support of Motion to Enforce Charging Lien. Based upon the record in this case, the Court finds that the Motion should be Granted in Limited Part and Otherwise Denied.

## I.  FINDINGS OF FACT

At the evidentiary hearing, the Court received documentary and testimonial evidence.  Based on the evidence presented, and based on a preponderance of evidence standard, the Court makes the following findings of fact.  To the extent that any findings of fact constitute conclusions of law, they are hereby adopted as such; to the extent that any conclusions of law constitute findings of fact, they are also so adopted.

### A.    *The Engagement to Represent MCS in this Case*

Managed Care Solutions, Inc. ("MCS") is a closely held Florida corporation based in Broward County, Florida.  Kara Atchison is its founder and Chief Executive Officer.  MCS assists hospitals in collecting monies due from third-party payors.  MCS had a contract with Baptist Health System, Inc. ("BHS"), which operated hospitals in the Birmingham, Alabama area, to assist Baptist in collecting monies due it from third-party payors.

When a contractual dispute arose between MCS and BHS, MCS hired Burstein & Associates, P.A. (the "Law Firm") to sue BHS. (Movant's Exh. A).  The fee agreement between the parties is set forth in an engagement letter dated September 7, 2007, as follows:

> This is to confirm the terms of engagement of Burstein & Associates, P.A. (the "Firm") in the above-referenced matter.  The Law Firm will ***represent*** MCS on a contingency-fee basis.  The fee charged will be 33 1/3 % of ***amounts recovered, whether by settlement or judgment***.  Notwithstanding the contingent nature of the fee, MCS will reimburse the Firm for costs and disbursements, such as service of process fees, filing fees, deposition costs, photocopies, etc.  These will be invoiced

> regularly and payment is due on receipt of the invoice
> reflecting the costs of disbursement. (Emphasis added).

(Movant's Exh. A).  The engagement letter, which was drafted by the Law Firm,
set forth in the second paragraph the fee to be received by the Law Firm if it was
discharged or terminated by MCS:

> The Firm (including its lawyers) reserves the right to
> withdraw at anytime should its continued representation
> conflict with ethical and/or professional obligations.  In the
> event that the Firm is required to *withdraw* for ethical or
> professional reasons of no fault of the Firm *or MCS*
> *discharges the Firm*, MCS agrees to pay a fee to the Firm
> based on its timekeepers standard hourly rates at the time
> services are rendered plus a 50% premium thereon.  For
> example, my current standard hourly rate is currently
> $230.00 an hour.  The premium rate would be $345.00 an
> hour.

(Movant's Exh. A; emphasis added).  It is undisputed that the engagement letter was
never amended or modified at any time.

### B.    *The Law Firm's Representation of Baruch and His Affiliated Companies*

Prior to the Law Firm's engagement to represent MCS against BHS, and during
the pendency of this lawsuit, the Law Firm also represented Raphael Baruch,
Atchison's husband, and companies he owns or is affiliated with in approximately
twelve cases ("the Baruch cases").  The Law Firm's services were provided on the
Baruch cases on an hourly basis, without a written retainer agreement.  MCS was not
a client in any of the Baruch cases.

Beginning in January 2006, payment in the Baruch cases began to be in arrears.
After an exchange of communications, the Law Firm agreed to continue to provide

representation in the Baruch cases based on what it perceived as Atchison's guarantee that invoices in those cases would be paid.  The Law Firm, however, never obtained confirmation in writing of its purported understanding regarding a guarantee by Atchison, and the evidence does not support it, at least for purposes of a charging lien proceeding involving MCS as the client who contracted with the Law Firm.

In January, 2008, Atchison emailed the Law Firm and explained that her husband was not "very organized" and sought to help him "get his businesses in order" by "turning over his accounting" to a bookkeeper to manage.  (MCS's Exh. 1).  At the end of January 2008, a payment towards the outstanding balance in the Baruch cases was made, and on March 14, 2008, Atchison informed the Law Firm:  "I will be cutting a check for Raphael on Monday for $5k, and will have a routine check each month." (Burstein Declaration, ¶ 9, 10).  Significantly, however, although evidence was presented that Atchison sought to act as a liaison to facilitate payment of the invoices in the Baruch cases, no evidence was presented that she guaranteed, *on behalf of MCS,* that those invoices would be paid from a recovery in this particular lawsuit.  The Court credits Atchison's testimony that she never expressly guaranteed such payments as being enforceable here with regard to MCS's pending case.

In any event, as previously stated, the Law Firm never obtained confirmation in writing that Atchison, on behalf of MCS, guaranteed payment of invoices in the Baruch cases from a recovery, if any, in this case.  To the contrary, in an email to Atchison on January 28, 2008, the Law Firm acknowledged that the cases were being kept separate from a financial perspective.  (MCS's Exh. 4).

Consistent with that understanding, Atchison stated in an email to the Law Firm on May 10, 2008, that MCS's cases were distinct from the Baruch cases, even though her husband was the "point of contact" for purposes of litigation. (MCS's Exh. 11).  Nor was any credible evidence presented that Baruch, on behalf of MCS, ever guaranteed that payment in the Baruch cases would be made from a recovery in this case.

In support of the contrary assertion, the Law Firm relies upon a single phrase in a January 28, 2008 email in which Baruch, referring to the outstanding invoices, wrote:

> If *I* get a resolution of *any* of the cases we have (including BHS) or if *I* sell one or both of the *houses I* would not have [a] problem anymore.  If *I* close on both of the *loans* as planned now, *I* will free some funds too …. Until then, I have to wait.  If you do not want to continue working on my cases, please inform me as soon as possible. ….

(Burstein Declaration, ¶ 9, 10; emphasis added).

But this email, by its own terms, indicates that Baruch anticipated that any one of numerous sources may provide funds to him that would in turn allow him to make payment on the invoices owed in the Baruch cases.  The potential recovery in BHS was not singled out as the source of payment for the invoices.  Instead, if Baruch received money from the sale of a house, or the closing of a loan, he indicated that those funds would be used to pay the Law Firm.  The potential recovery in the BHS case was not proposed as a "guarantee" of payment in lieu of monthly payments on the invoices, and even if it could somehow be construed as such a proposal, it was never accepted by the

Law Firm.  Again, the Law Firm never obtained confirmation in writing of its understanding of this email as a "guarantee."

In addition to reviewing the email itself, the Court credits the testimony in this regard from Baruch himself as to what he intended by his email.  He explained that one of his companies, BCA Corp., provides MCS with software services and when this email was written, MCS owed BCA Corp. money.  Baruch explained that if any of MCS's cases were resolved, including but not limited to BHS, MCS could pay BCA Corp. the money it owed that company and funds would then be available to Baruch to pay the Law Firm.  Baruch did not intend to convey by that email that the outstanding invoices owed in the Baruch cases would be paid *by MCS*.  The Court accepts the testimony of Baruch on this issue and specifically finds as a matter of fact that he did not agree, on behalf of MCS, that the Law Firm would be paid for the outstanding invoices in the Baruch cases from a recovery, if any, in this case.

The Law Firm provided legal services in the Baruch cases until April 8, 2008, when it sent a letter to Baruch stating that because payments had ceased, it was going to withdraw and assert its lien rights.  (MCS's Exh. 7).

### C.    *The Law Firm Ceases Providing Legal Services to MCS*

Conflicting evidence was presented as to whether, after the Law Firm withdrew from the Baruch cases, it sought to withdraw from this case or was terminated by MCS.  Arguably, had the law firm voluntarily withdrawn without cause, the Court could have found that it voluntarily forfeited the right to any fee in the case.[1]

---

[1]    *See Faro v. Romani,* 641 So. 2d 69, 71 (Fla. 1994) (attorney's withdrawal without cause from contingency fee contract waived any entitlement to recover a fee).

However, the Court need not make that determination, because MCS concedes that the written fee agreement, and specifically paragraph two of the fee agreement, applies in this case regardless of whether the Law Firm withdrew or was terminated. (Movant's   Exh. A).   Moreover, MCS stipulated at the hearing that, as this is an equitable proceeding, the Law Firm should receive a fee.   MCS questions only the amount of that fee.   (Hearing Trans. at 137, 185).   Therefore, for purposes of this case, MCS is conceding that, at the very least, the Law Firm stands in the shoes of a law firm discharged by the client without cause, which under Florida law may allow it to some reasonable fee for work performed prior to its discharge.

The Law Firm, however, does not accept that concession.   It maintains that it should not be treated as a discharged Law Firm at all, but rather that it remains to this day as counsel of record for MCS, thereby entitling it to receive the maximum agreed upon fee in the case based on the satisfaction of the contingency.   The Law Firm concedes that on April 15, 2008, the Law Firm sent a letter stating that it believed MCS terminated its services in this case and that its termination "has certain consequences under the Retainer Agreement that MCS signed in the Baptist case." (MCS's Exh. 9).   The Law Firm sought to inform MCS that it would be billed the "premium" rate for time expended in this case, pursuant to paragraph two of the engagement letter.   The Law Firm further informed MCS that it was "ceasing any and all further work in connection with MCS's matters" and concluded by stating that an invoice was being prepared. (MCS's Exh. 9).

Shortly thereafter, consistent with that letter, on April 29, 2008, the Law Firm forwarded an invoice to MCS for all services rendered from July 21, 2007 through April

27, 2008 in this case.  (Burstein Declaration, Exh. 1).   Pursuant to the second paragraph of the engagement letter, which provides for "a 50% premium" on the standard hourly rate if MCS terminates its services (Movant's Exh. A), the Law Firm utilized a rate of $345.00 per hour and demanded payment of $119,711.25 for "total fees." (Burstein Declaration, Exh. 1).  That same day, the Law Firm filed its Notice of Charging Lien and Retaining Lien [D.E. 45], and also filed a motion to withdraw [D.E. 44].

On May 9, 2008, the Court entered an Order stating that the motion was conditionally denied, explaining:  "In view of the September 1, 2008 trial schedule, the Court will not allow a withdrawal *unless* new counsel agrees to appear and follow the trial schedule issued in this cause on January 17, 2008." [D.E. 55] (emphasis added).

On May 13, 2008, in compliance with the condition stated in the Order, the law firm of Warren R. Trazenfeld, P.A. filed a notice of appearance on behalf of MCS and new counsel stated that the trial schedule would be followed. [D.E. 58].  From that point forward, the Law Firm never "appeared" or took any action in the case on behalf of its now former client, MCS.  Indeed, the Law Firm concedes that it was entitled to file a renewed motion to withdraw based upon the satisfaction of Judge Graham's conditional denial.  The Law Firm, however, claims that it was no longer responsible for that task and left the matter to MCS's substitute counsel to handle.  Though MCS's new counsel disputes this, there is no dispute that a renewed motion to withdraw, or a motion to discharge former counsel, was never filed on the record by either the Law Firm or MCS's new counsel.

Yet the Court reiterates that, notwithstanding the absence of such a filing, from that point the Law Firm took no action whatsoever to further the prosecution of the case or achieve a settlement for MCS. It did not conduct discovery, take depositions, appear at any hearing, calendar call, or pretrial conference on MCS's behalf. The Law Firm also did not draft, edit, or file a joint pretrial stipulation, voir dire questions, jury instructions, exhibit or witness lists for trial, or any other document necessary for MCS to comply with the Court's scheduling deadlines. The Law Firm also concedes that it did not negotiate with opposing counsel from that point towards obtaining a settlement, or otherwise perform *any* legal services in this case from the date that it treated itself as being discharged and substitute counsel appeared to represent MCS's interests who agreed to abide by the trial schedule. (MCS's Exh. 11). The Law Firm concedes that its continued appearance as counsel of record for MCS from May 13th was entirely technical and not substantive. (Hearing Trans. at 151-152).

### D. *Settlement of This Case*

The suit against BHS was settled in August, 2008, shortly before trial, materially due to the work undertaken by MCS's substitute counsel following his appearance. Following the parties' completion of the settlement [D.E. 87], the Law Firm was notified in compliance with the charging lien filed on April 29, 2008 [D.E. 45]. The parties then agreed to escrow $1,317,735.56 from the settlement amount paid to MCS pending resolution of the issues arising under the charging lien. The Law Firm insisted on this amount being escrowed based on its assertion that it was entitled to either 1/3 of the recovery in this case plus costs, and the outstanding invoices in the

Baruch cases, or alternatively the amount of the invoice sent on April 28, 2008 for work performed in this case plus costs, and the outstanding invoices in the Baruch cases. (Hearing Trans. at 47:13-23).  The remaining settlement monies were distributed to MCS.  The escrowed monies were then filed, as permitted by the Court [D.E. 95], in the Court's registry.

The Law Firm seeks recovery against the settlement in this case pursuant to the first paragraph of the engagement letter, *i.e.*, 33 1/3% of the settlement.  Alternatively, the Law Firm seeks recovery pursuant to the second paragraph of the engagement letter, *i.e.*, $119,711.25 for fees.  In addition, the Law Firm seeks to recover from this settlement for the outstanding invoices in the Baruch cases, an amount claimed to be $314,467.96 (Burstein Declaration, ¶ 14).  The Law Firm does not seek to recover for any other work performed for MCS on other cases.  (Hearing Trans. at 40:17-22).

## II.   CONCLUSIONS OF LAW

### A.   *General Principles Governing Enforcement of Charging Liens*

"Federal courts, although they recognize no common-law lien in favor of attorneys, give effect to the laws of the states in which they are held." *State Contracting & Engineering Corp. v. Condotte America, Inc.*, No. 97-7014-CV, 2004 WL 5500705, at *14 (S.D. Fla. Oct. 27, 2004), (citing *Gottlieb v. GC Financial Corp.*, 97 F. Supp. 2d 1310 (S.D. Fla. 1999) (citing *Webster v. Sweat*, 65 F.2d 109, 110 (5th Cir. 1933)).  Under Florida law, a charging lien is a mechanism that allows an attorney to enforce an equitable right to have costs and fees owed for legal services secured by the judgment or recovery in a lawsuit.  *Id.* (citing *Sinclair, Lewis, Siegel, Heath, Nussbaum*

& *Zavertnik, P.A. v. Baucom*,  428 So. 2d 1383, 1384 (Fla. 1983)).  "All proceedings in Florida to resolve an attorney's charging lien for legal services are equitable in nature." *State Contracting,* 2004 WL 5500705 at *15 (citing *Nichols v. Kroelinger,* 46 So. 2d 722 (Fla.1950)).

To impose a charging lien, a court sitting in equity must find the following four elements:  (1) an express or implied contract between the attorney and client; (2) an express or implied understanding that payment is either contingent upon recovery or will be paid from the recovery; (3) an attempt by the client to avoid paying or a dispute as to the amount of the fee; and (4) a timely notice of a request for a lien. *Id*. (citing *Sinclair,* 428 So. 2d at 1385).

## B.     ***The Lien for Services Rendered in this Case***

The Law Firm is entitled to enforce a charging lien against the recovery in this case for services rendered in this case.  All four of the elements above are satisfied with respect to the lien.  MCS concedes as much, but disputes the method by which the Law Firm's fee should be calculated.  For the most part, we agree with MCS's position and reject the Law Firm's attempt to circumvent well established Florida law by obtaining a recovery to which it is not entitled.

### 1.     ***The Law Firm is Not Entitled to a Contingent Fee***

The Law Firm asserts that it is entitled to a fee representing 1/3 of the settlement amount, pursuant to the first paragraph of the engagement letter.  The sole argument advanced for such a recovery is that the Law Firm was technically still counsel of record on the Court's docket at the time that MCS entered into a settlement

with the Defendant in the case, which settlement resulted in a material monetary payment in MCS's favor.  The Law Firm contends that, because a second order was not entered *due to the lawyers'* failure to file a a renewed motion to withdraw or a motion for reconsideration, it should receive 1/3 of the settlement as provided in the first paragraph of its contract.

We squarely reject this argument because it represents an unwarranted end-run around settled Florida law.  In *Rosenberg v. Levin,* 409 So. 2d 1016, 1021 (Fla. 1982), the Florida Supreme Court adopted the modified quantum meruit rule and held that an attorney who is employed under a valid contingency-fee agreement, and who is discharged without cause before the contingency has occurred, is entitled to recover "the reasonable value of his services rendered prior to discharge."  The Supreme Court further held that the only proper basis for determining the reasonable value of the attorney's services was quantum meruit, as opposed to the entire contingent payment contemplated by the parties when they entered into the contract.  It is clear from the Court's opinion that protecting Florida clients' rights to obtain new counsel was paramount:

> It is our opinion that it is in the best interest of clients and the legal profession as a whole that we adopt the modified quantum meruit rule which limits recovery to the maximum amount of the contract fee in all premature discharge cases involving both fixed and contingency employment contracts.  The attorney-client relationship is one of special trust and confidence.  The client must rely entirely on the good faith efforts of the attorney in representing his interests.  This reliance requires that the client have complete confidence in the integrity and ability of the attorney and that absolute fairness and candor characterize all dealings between them.  These considerations dictate that clients be given greater freedom to change legal representatives than might be tolerated in other employment relationships.  We approve the philosophy

that there is an overriding need to allow clients freedom to substitute attorneys without economic penalty as a means of accomplishing the broad objective of fostering public confidence in the legal profession. Failure to limit quantum meruit recovery defeats the policy against penalizing the client for exercising his right to discharge. However, attorneys should not be penalized either and should have the opportunity to recover for services performed.

*Id.* at 1021.

*Rosenberg* added that, in computing the reasonable value of the discharged attorney's services, "the trial court can consider the totality of the circumstances surrounding the professional relationship between the attorney and client. Factors such as time, the recovery sought, the skill demanded, the results obtained, and the attorney-client contract itself will necessarily be relevant considerations." *Id.* at 1022.

This latter principle was subsequently clarified by the Supreme Court in *Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Poletz,* 652 So. 2d 366, 369 (Fla. 1995), where the Court explained that "a quantum meruit award must take into account the actual value of the services to the client." The Court meant that "while the time reasonably devoted to the representation and a reasonable hourly rate are factors to be considered in determining a proper quantum meruit award, the court must consider all relevant factors surrounding the professional relationship to ensure that the award is fair to both the attorney and the client." *Id.* In other words, courts must consider the "totality of the circumstances" present in the case to determine a "reasonable value for the services rendered" by the attorney, which factors can also take into account the considerations found in Rule 4.1-5(b) of the Rules Regulating the Florida Bar. *Id.*

In addressing the Law Firm's argument for recovery of the entire 1/3 contingent fee contracted for under the parties' engagement letter, *Rosenberg* and *Searcy Denney* require us to ask whether that entire fee would represent the "actual value of the services to the client." It clearly does not because the Law Firm had no material involvement in the ultimate resolution of the case through the settlement agreement entered into between MCS and the party Defendant. The Law Firm had no involvement in the case for almost three months prior to the point when a settlement was reached. At that point, a settlement had not been agreed upon. To the contrary, the client was rejecting the Law Firm's recommendation to accept a settlement demand that was substantially less than what the client ultimately obtained. Indeed that point of disagreement contributed to the fall-out between the lawyer and client. For the Law Firm now to recover a fee that is premised entirely upon a settlement that it did not negotiate, and did not even advocate, would represent an offense to the very principles that govern all lawyers practicing in Florida.

The Law Firm's factual premise is also wrong. Judge Graham's Order that denied without prejudice the original motion to withdraw expressly approved of the discharge of the Law Firm if new counsel appeared and agreed to abide by the trial schedule. That condition was satisfied by the notice of appearance filed in this case. Substitute counsel's filing of that notice in compliance with the Order constituted the "leave of Court" and "order of substitution" necessary for new counsel to represent MCS.[2]

---

[2]        Local Rule 11.1(D) provides in pertinent part:

Under these circumstances, arguably Local Rule 11.1(D) did not require a further order to accomplish the substitution of counsel.  As the Eleventh Circuit has stated:  "Even though a court's local rules are binding on parties, their enforcement must be tempered with due consideration of the circumstances of the case." *Cohen v. Carnival Cruise Line, Inc.,* 782 F.2d 923, 924 (11th Cir. 1986).  Therefore, the necessary predicate for the Law Firm's theory – its continued status as counsel of record for MCS at the time the case settled – fails.

At the very least, the filing of new counsel's notice of appearance complied with the spirit, if not the letter, of the Local Rule, and does not support the Law Firm's argument that it remained counsel for MCS simply because the Clerk of the Court did not, as a ministerial matter, remove counsel's name from the docket after the notice of appearance was filed.  Certainly, the lawyers could have, and should have, clarified the record when that did not automatically happen by filing the renewed motion to withdraw/discharge.  The lawyers were in fact working towards such a filing at the time, but for some reason neither lawyer pursued the matter.  It would simply be untenable for the lawyers' or the Clerk's mis-steps to justify a fee award that Florida law clearly does not require and does not contemplate.

---

3.    No attorney shall withdraw the attorney's appearance in any action or proceeding except by *leave of Court* after notice served on the attorney's client and opposing counsel.

4.    Whenever a party has appeared by attorney, *the party cannot thereafter appear* or act on the party's own behalf *in the action or proceeding, or take any step therein,* unless an *order of substation* shall first have been made by the Court, after notice to the attorney of such party, and to the opposite party; … (Emphasis added).

For this reason, the Court, sitting in equity, alternatively finds that, to the extent the procedure for substituting counsel was not effected perfectly here, the Law Firm has no standing to benefit therefrom.  As previously noted, it could have filed a motion for reconsideration of its motion to withdraw, but chose not to, and now seeks to benefit from its own inaction to the substantial detriment of MCS, which would be required to pay 1/3 of the recovery to the Law Firm in addition to the fee it agreed to pay new counsel.  Likewise, although a motion for substitution was partially executed and could have been filed, the original document remained with the Law Firm.  Therefore, the Law Firm bears as much responsibility as new counsel for that motion not being filed with the Court.

When all is said and done, the parties' statements and actions demonstrate that they understood the notice of appearance to have the effect of substituting new counsel and acted accordingly thereafter.  It is undisputed that the Law Firm took no action to prosecute the case, or otherwise provide representation to MCS, after that notice was filed.  Therefore, it would be grossly inequitable for the Law Firm to receive a fee it did not earn.  It was new counsel that prepared the case for trial and, ultimately, successfully negotiated a settlement on behalf of MCS.

Moreover, the Law Firm's own actions support that finding.  The Law Firm not only filed a motion to withdraw and a notice of charging lien in May 2008, but it also sent a final invoice to MCS demanding payment in accordance with the *second paragraph* of the engagement agreement.  The Law Firm clearly and unequivocally acknowledged the applicability of that provision in its April 15, 2008 letter to MCS by

stating that its perceived termination "has certain consequences under the Retainer Agreement," by which it meant that MCS would be billed the premium rate pursuant to paragraph two, and it was.  For the Law Firm to now disavow that position and claim, instead, that the parties intended for the Law Firm to recover a 1/3 fee if it withdrew or was terminated but technically remained "counsel of record" on the Court docket is disingenuous.

Finally, the parties' fee agreement states that the Law Firm would receive 1/3 of the settlement proceeds only if it "represent[ed]" MCS at the time of settlement.  The Law Firm's assertion that, because it technically remained counsel of record on the Court docket, even though it was providing no legal services to the client at that time, does not comport with the language of the contract, particularly when read in its entirety, and is clearly an attempt to receive more than it bargained for in the contract it drafted.  The rules of construction require that contracts be construed against the drafter and retainer agreements are no exception.  "Retainer agreements are construed against the attorney and in favor of the client." *Vargas v. Schweitzer-Ramras*, 878 So. 2d 415, 417-18 (Fla. 3d DCA 2004); *see also City of Homestead v. Johnson,* 760 So. 2d 80, 84 (Fla.2000) (where terms of an agreement are not plainly clear and, instead, are vague and subject to interpretation, terms should be construed against the drafter - the lawyer).  Because the Law Firm drafted this agreement, and its interpretation unreasonably burdens the client without clear and unambiguous agreement on the face of the agreement, it must be construed against the Law Firm.[3]

---

[3]    The Law Firm forgets that the Court's Local Rules do not create substantive contract rights between parties.  The Law Firm has cited no authority to support that

Accordingly, for all of the foregoing reasons, the Court rejects the Law Firm's self-serving argument, which if accepted would amount to a penalty against the client for the Law Firm's own neglect in properly withdrawing from the case as it intended. Such a result violates the spirit and the letter of Florida law.  *See also Florida Bar v. Hollander,* 607 So. 2d 412, 415 (Fla. 1992) (fee contract clauses that provided that law firm was entitled to a fee equal to the percentage amount stipulated in the contingency fee agreement unless any new counsel "worked out a mutually agreeable fee agreement," which had the effect of intimidating a client from exercising the right to terminate representation, were unenforceable and unethical) (citing in part *Florida Bar v. Doe,* 550 So. 2d 1111, 1113 (Fla. 1989), ("[a]n attorney cannot exact a penalty for a right of discharge.").  The Court holds that the Law Firm is not entitled to receive 1/3 of the settlement recovered in this case.

### 2.     *The Law Firm is Entitled to Recover a Quantum Meruit Fee*

The Law Firm then asserts that if it is not entitled to receive a 1/3 fee pursuant to the first paragraph of the parties' agreement, it should be awarded the "premium" fee it billed MCS.  The Law Firm contends it is "owed the sum of at least $122,764.40 in fees and costs, disbursements and out-of-pocket expenses, pursuant to a retainer (contingency) agreement with the Law Firm."  The $122,764.40 figure is based on fees in the amount of $119,711.25 and costs of $3,053.15.  The Law Firm calculated the fee of $119,711.25 by relying on the second paragraph of the fee agreement quoted above,

---

proposition, and the Court is aware of none.  Therefore, even if there had been a failure to comply with the Local Rule, it would not give rise to a substantive right to the Law Firm to receive a fee it would otherwise have no right to receive.

and enhancing its hourly rate by 50%.  The parties' agreement established a standard hourly rate of $230.00 and a "premium rate" of $345.00 an hour" if it withdrew or was discharged, which is what occurred in this case.

MCS challenged certain of the time entries included in the Law Firm's application as being unreasonable.  MCS agreed, however, that under the second paragraph of the engagement agreement it was bound to pay the "premium" hourly rate identified in the agreement, taking the position that the contract rate governs the case as opposed to the "quantum meruit" recovery contemplated by *Rosenberg*.

The Court disagrees.  The parties' agreed-upon conclusion that the Court must apply the premium hourly rate in the fee agreement ignores the Supreme Court's *Searcy Denney* decision that expressly provides that the parties' fee agreement is only one of many factors analyzed to arrive at an appropriate fee for the discharged lawyer. "The court must consider any other factors surrounding the professional relationship that would assist the court in fashioning an award that is fair to both the attorney and client.  *For example, the fee agreement itself, the reason the attorney was discharged, actions taken by the attorney or client before or after discharge, and the benefit actually conferred on the client may be relevant to that determination.*  The determination as to which factors are relevant in a given case, the weight to be given each factor and the ultimate determination as to the amount to be awarded are matters within the sound discretion of the trial court."  652 So. 2d at 369 (emphasis added).

And remember that, under *Rosenberg,* the parties' fee agreement may set the maximum amount that may be awarded, but does not set the floor.  The fact that the

parties here agreed that a "premium rate" could be awarded if the client discharged the lawyer does not require *the Court* to award that rate when it finds that all other applicable factors point in a different direction.  The parties have cited no case to the contrary, and we have found none.  It is clear that, under *Searcy Denney,* the Court is *not* bound by any premium rate negotiated by the parties.

Indeed, one could make the argument that the premium rate charged here could be a penalty that unethically intimidates the client and prevents her from discharging her counsel when she deems it appropriate to do so.  *Rosenberg* was clearly adopted to prevent such a practice.

That being said, given Bernardo Burstein's experience, the nature of the work performed, the nature of the legal services required in this case complex commercial case, coupled with the parties' agreed upon hourly rates, the Court will not reduce the agreed-upon hourly rate even though it has the power to do so.  The Court finds that the Law Firm is entitled to the sum of $122,764.40 based on the factors set forth in *Searcy Denney,* and limited by the maximum amount allowed under the contract.  In so finding, the Court has considered the factors in Florida Bar Rule 4-1.5(b), and all relevant factors surrounding the professional relationship, including the actions taken by the Law Firm, the extent to which they benefitted MCS, the skill demanded and demonstrated, and the results obtained.  In concluding that the Law Firm is entitled to receive $122,764.40, the Court has considered the totality of the circumstances, as well as the time reasonably expended and the reasonable hourly rate.[4]

---

[4]      The Court also reviewed the time entries submitted in camera in support of the fee application, and finds that for the most part the hours expended were reasonable,

**C.**   ***The Lien for Services Rendered in the Baruch Cases***

The Law Firm also seeks to enforce a lien against the proceeds of this case for the outstanding invoices in the Baruch cases allegedly totaling approximately $300,000.   Like its argument in support of recovery of a full contingent fee, this position is equally meritless.

In Florida, a charging lien applies only to legal services rendered in the case that produced the recovery, absent an express contractual provision to the contrary.   In *Jaye v. Royal Saxon, Inc.*, 687 So. 2d 978 (Fla. 4th DCA 1997), the Court pointed out that fees and costs incurred outside a suit are not, absent special circumstances, covered by a charging lien.   *Id.* at 981.   *See also Hogben v. Wyndham International, Inc.*, No. 05-20944-CIV, 2007 WL 2225970, at *9 (S.D. Fla. Aug. 1, 2007).   In *Jaye*, the retainer agreement in a malicious prosecution case explicitly stated that the attorney would have a lien on any recovery for fees and costs incurred in other representation of Jaye. *Id.*  Therefore, in *Jaye*, the court could conclude that the client acquiesced in the court recognizing a lien to that extent on the total proceeds received in the malicious prosecution case.   *Id.*

Here, it is undisputed that the invoices in the Baruch cases are for fees and costs incurred outside this suit.   Unlike *Jaye*, there is no express contractual provision in which MCS agreed that fees and costs incurred in the Baruch cases could be recovered from this case.   The only written fee agreement between the parties is an engagement

---

adequately documented, and reasonably necessary to the work required in the case. Accordingly, the entire amount of the quantum meruit fee requested by the Law Firm will be awarded.

letter dated September 7, 2007, which was never modified or amended, and makes no provision for the Law Firm to recover from this case fees or costs that may be due for work performed in other, unrelated cases. That agreement is clear on its face and allows no such recovery.

Moreover, as previously stated, the Court fully credits the testimony of Atchison and Baruch in this regard and finds that neither of them guaranteed the Baruch invoices would be paid from a recovery in this case. To the extent the Law Firm may have had a different understanding or perception, it was the Law Firm's obligation to take all necessary steps to confirm that belief by amending the fee agreement between the parties. Accordingly, the Law Firm cannot impose a charging lien against the settlement in this case because it has failed to establish the first element required to do so, an express or implied contract between the attorney and client.

Finally, a charging lien will not generally attach to anything other than the "tangible fruits" of the lawyer's services. *E.g., Correa v. Christensen,* 780 So. 2d 220 (Fla. 5th DCA 2001). That means that "[b]y definition, an attorney's charging lien cannot attach to property not involved in the suit and not before the court." *Cole v. Kehoe,* 710 So. 2d 705, 706 (Fla. 4th DCA 1998); *see also Franklin & Marbin, P.A.,* 711 So. 2d 46, 53 (Fla. 4th DCA 1996) (charging lien proceeding only applies when "identifiable property recovered as a result of the lawyer's labors"); *Litman v. Fine, Jacobson, Schwartz, Nash, Block & England, P. A.,* 517 So. 2d 88, 92 (Fla. 3d DCA 1987) ("the lien will attach only to the tangible fruits of the services").

For these reasons, the Court readily concludes that the Law Firm is not entitled to recover on its lien to the extent it seeks recovery for the Baruch cases from the settlement funds recovered in this case.

### III.   RECOMMENDATION

In accordance with these Findings of Fact and Conclusions of Law, the undersigned Magistrate Judge RECOMMENDS that the District Court find as follows:

1.    The Motion to Reopen Case and to Enforce and Foreclose on Charging Lien [D.E. 89] should be Granted in Limited Part and Otherwise Denied.

2.    The Court has jurisdiction to adjudicate the charging lien filed by Burstein & Associates, P.A. to enforce its right to obtain payment for legal service rendered from the monetary recovery obtained in this lawsuit by Plaintiff, MCS.

3.    The Court, sitting in equity, finds that the Law Firm is entitled to a fee payable from MCS's recovery in the lawsuit as follows.  The Clerk of the Court should be directed to release funds held in this action from the Court Registry as follows.  Payment in the amount of $ 122,764.40, plus a pro rata share of the accumulated interest, shall be payable to Burstein & Associates, P.A.  Payment in the amount of $1,194,971.16, plus a pro rata share of the accumulated interest, shall be payable to Managed Care Solutions, Inc.

4.    Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Donald L. Graham, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge

of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE and SUBMITTED** in Chambers, at Miami, Florida this 27th day of April, 2009.

_____
EDWIN G. TORRES
United States Magistrate Judge

Copies provided to:
Honorable Donald L. Graham
Counsel of Record